UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Farmers Insurance Exchange, Truck
Insurance Exchange, Fire Insurance
Exchange, Mid-Century Insurance
Company, Farmers New World Life
Insurance Company, and Illinois
Farmers Insurance Company,

Civil No. 11-2297 (PAM/JJK)

Plaintiffs,

v.

**MEMORANDUM AND ORDER**

Theodore West and
Tedd West Insurance Agency, Inc.,

Defendants.

---

This matter is before the Court on Plaintiffs' Motion for Summary Judgment. For the reasons that follow, Plaintiffs' Motion is granted.

**BACKGROUND**

In June 2003, Defendant Theodore West became a District Manager for Farmers Insurance Company[1] pursuant to a District Manager's Appointment Agreement (DMAA). West's duties included: (1) recruiting and training Farmers agents; (2) exclusively representing Farmers in the conduct of the District; and (3) conforming to all of Farmers's

---

[1] Plaintiffs are Farmers Insurance Exchange, Truck Insurance Exchange, Fire Insurance Exchange, Mid-Century Insurance Company, Farmers New World Life Insurance Company, and Illinois Farmers Insurance, all of which are related and each of which is a signatory to the agreements at issue. The Court will refer to them collectively as "Farmers."

regulations, operating principles, and standards. (DMAA (Docket No. 87-1 at 91-94) ¶ B.) West understood that his role was to recruit and manage his agents, not to sell insurance. (West Dep. (Docket No. 87-1) at 37-38; see DMAA ¶ A.1.) West received a percentage of the commissions earned by the agents within his District, which included Hennepin and surrounding counties. (West Dep. at 27; Pierce Aff. (Docket No. 88) ¶ 4; DMAA ¶ A.1.)

The DMAA states that it may be terminated without cause by either party with 30 days' written notice. (DMAA ¶ D.) In the event of termination, Farmers is obligated to pay "Contract Value" to West based on a formula set forth in the DMAA. (Id. at 2.) The DMAA also expressly forbids West from "directly or indirectly in any manner" soliciting, accepting, or servicing for or on behalf of himself or any insurer 'the insurance business of any of the [Farmers] Policyholders" in West's territory and "immediately adjoining counties" for one year following the termination. (Id. ¶ F.) The DMAA contains an integration clause stating that it "supersedes and takes the place of any and all prior agreements, written or otherwise, between [West and Farmers]." (Id. ¶ J.)

In 2004, West formed the Tedd West Insurance Agency, Inc., for which he was the sole shareholder, director, and officer of the agency. Farmers and the Tedd West Insurance Agency entered into a Corporate District Manager Agreement that is in all relevant respects identical to the DMAA.[2] (See Corp. DMAA (Docket No. 87-1 at 95-99).)

---

[2] Because their rights and obligations are the same for purposes of this matter, the Court will refer to West and his agency collectively as "West."

West's resignation followed an altercation he had with a female agent within his District, Jena Lund, and with whom he was romantically involved. Some of the facts of the altercation are in dispute, but West acknowledges that he was verbally aggressive towards Lund in the District office and that he swept materials off her desk and onto the floor. Lund claims that West also physically assaulted her, which West denies. Lund secured an ex parte order for protection from Anoka County District Court[3] and shortly thereafter resigned her position with Farmers.

Lund reported the incident to Farmers. Farmers investigated, interviewing both Lund and West, and discovered several concerning facts. First, Lund disclosed that she split the commissions she earned from writing policies for Legacy Management—an apartment management company—with West. West told Lund that he would allow her to write the Legacy business if she agreed to pay him half of the Legacy commissions as a "consulting fee." (West Dep. 167-70; Weinstein Aff. (Docket No. 87) Ex. E.) Lund agreed to do so. When Lund failed to pay West the consulting fee on one occasion, his lawyer sent her a demand letter threatening suit. (Weinstein Aff. Ex. G.) West justified this arrangement with Lund by stating "I read my contract and it's not in there that I can't." (West Dep. at 168.) However, because West already received a portion of the Legacy commissions under the DMAA, Farmers concluded that his arrangement with Lund violated the DMAA. (DMAA ¶ A.1.; West Dep. 163-64, 167.)

---

[3] After a full hearing the court declined to issue a permanent order for protection because Lund faced no "threat of imminent physical injury." (Pierce Aff. Ex. G at 45.)

Second, Farmers learned for the first time that Lund and West were romantically involved at the time West recruited Lund, which also violated Farmers policy. (Locke Aff. ¶¶ 27, 32.) Third, West admitted that he engaged in a lengthy and heated argument with Lund at the office during which he yelled at her, swept her belongings from her desk onto the floor, and stomped on her sunglasses. (Id. Ex. E at 1-2.) Farmers determined that West's altercation with Lund was highly inappropriate and violated the DMAA, even crediting West's statement that he did not physically assault Lund. (Id.) Based on all of the facts revealed during the investigation, Farmers concluded that it would terminate West's contract. West resigned before he could be terminated, effective December 1, 2010.

The parties agree that West's net Contract Value was $109,805.56, which Farmers was due to pay in three semi-annual installments of $36,601.85 following termination. Farmers made the first such payment in January 2011. In April 2011, West gave notice to Farmers that Legacy was cancelling its Farmers policies in favor of other insurance company, National Housing Insurance Group. The record establishes that West was involved in accepting and servicing the Legacy policies with the new insurer, in direct violation of the DMAA. (See DMAA ¶ F.) West received a 50% commission from NHIG on the Legacy policies and admitted to servicing those policies. (West Dep. at 202-03.) West does not deny that this occurred within the one-year non-competition period. Farmers then withheld the remaining Contract Value payments and filed this suit.

Farmers's Complaint alleges breach of contract, breach of fiduciary duty, misappropriation of trade secrets, tortious interference with prospective and existing business

4

and contractual relations, declaratory judgment, and injunctive relief. In response to the Complaint, West raised the following counterclaims: breach of contract (failure to pay contract value), deceptive trade practices, breach of contract (failure to pay addendum compensation), unjust enrichment, breach of the duty of good faith and fair dealing, racial discrimination under federal law, defamation, injunctive relief, declaratory judgment, and punitive damages. Farmers now moves for summary judgment on its breach-of-contract claim and on all of West's counterclaims. West has withdrawn his deceptive trade practices, unjust enrichment, breach of the duty of good faith and fair dealing, and defamation claims. The Court will address the remaining claims in turn.

**DISCUSSION**

Summary judgment is appropriate where there are no genuine issues of material fact and the case can be decided as a matter of law. Fed. R. Civ. P. 56. The moving party bears the burden of proof and the evidence must be viewed in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). Yet "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Id. at 323; Enter. Bank v.

Magna Bank, 92 F.3d 743, 747 (8th Cir. 1996). A party opposing a properly supported motion for summary judgment may not rest on mere allegations or denials, but must set forth specific facts in the record showing that there is a genuine issue for trial. Anderson, 477 U.S. at 256.

**A.      Breach of Contract (Farmers's Claim)**

Farmers claims that West breached the DMAA by writing the Legacy policies with NHIG within one year of terminating the DMAA. The DMAA expressly provides that West could not "directly or indirectly in any manner solicit, accept or service, for or on behalf of himself[] or any insurer or broker, the insurance business of any of the [Farmers's] Policyholders . . . in the [defined] territory for a period of one year [after termination]." (DMAA ¶ F.) West denies that he had anything to do with luring Legacy away from Farmers, but the record clearly establishes that he wrote Legacy's NHIG policies and that he received a substantial commission for doing so. (West Dep. at 202-03.) At a minimum, this conduct violates the DMAA's prohibition against "accepting" the business of any Farmers's insured.

West defends this claim by arguing that Farmers allowed departing district managers to take the business of their friends and family with them. Because Legacy's owner was West's friend, West contends that his conduct was appropriate. West testified that several people told him about this "friends and family" policy before he signed that DMAA. Even if true, the DMAA contains no such exception and the integration clause makes clear that the

6

DMAA reflects the sole agreement of the parties. West's argument is therefore barred by the parol evidence rule under which "extrinsic evidence is inadmissible to vary, contradict, or add to a written contract which is unambiguous, and in the absence of fraud, mistake, or accident, the written contract will be viewed as expressing the final intention of the parties upon the subject of the contract." U.S. Through Small Bus. Admin. v. Light, 766 F.2d 394, 396 (8th Cir. 1985). The DMAA is unambiguous and there is no genuine dispute that West acted in violation of its terms in accepting Legacy's business on behalf of NHIG.

West also argues that he did not violate the non-solicitation agreement because Legacy's successor-in-interest, Premier Housing Group, made the decision to leave Farmers, thus breaking the connection between West and Legacy's cancellations. West misses the point. It does not matter that Legacy allegedly changed hands at some point.[4] Nor does it matter that Legacy (or its successor) might have left Farmers irrespective of West. The key facts are that Legacy left Farmers in favor of NHIG and that West accepted that business on behalf of NHIG. West's involvement in Legacy's move to another insurer directly violated the DMAA's non-competition provision, regardless of whether Legacy changed ownership during that process.

Farmers has submitted a detailed expert report concluding that Farmers lost profits totaling approximately $190,000 due to Legacy's policy terminations. (Marino Aff (Docket

---

[4] It bears noting that West has done nothing to support his allegation that Legacy was sold to Premier at any time relevant to this suit. West points to a sealed e-mail in support of his argument, but the e-mail is unhelpful to him in every respect. (See Weinstein Aff. Ex. K.)

No. 90) Ex. 1.) West has done nothing to rebut Farmers's expert report. Thus, there is no issue of fact as to whether Farmers suffered damages due to West's breach. Accordingly, there are no genuine issues of material fact precluding summary judgment in favor of Farmers as to liability on its breach-of-contract claim.[5]

**B.     Breach of Contract (West's Counterclaim)**

   **1.     Failure to Pay Contract Value**

West contends that Farmers breached the DMAA by failing to pay him the final two installments of the Contract Value. Farmers admits that it has not made those payments, but argues that its failure to pay is excused by West's breach or as an allowable offset in light of the uncontested $190,000 loss it has suffered due to West's breach.

For the first argument, Farmers noted that the DMAA ties Contract Value payments to West's promise not to solicit Farmers policyholders for one year post-termination:

> For the payment tendered or received, the District Manager . . . agree[s] that for a period of one year following the date of termination or cancellation of this Agreement, [he] will neither directly nor indirectly singly, or in concert, solicit, accept, or service the insurance business of any policyholder of record in the agencies as defined in paragraph G above.

(Corp. DMAA ¶ L.)

Farmers contends that under the "prior breach doctrine" it was not required to make the remaining payments given West's breach of the non-compete clause. See Sierra Petroleum Co. v. Beaudry Oil & Serv., Inc., No. 08-6466, 2011 WL 2036974, at *16 (D.

---

[5] Farmers does not seek summary judgment on the issue of damages. (Pls.' Supp. Mem. at 12-13.)

Minn. May 24, 2011) (Montgomery, J.) ("Under the 'prior breach' doctrine, the non-performance of one party under a contract excuses the future contractual obligations of the other party."). West responds that the prior breach doctrine does not excuse Farmers's payment obligation because his own breach was not material. West is correct that the "breach by the first party must be material and uncured to excuse the second party from performance" and that the determination of materiality is typically a fact question. Nutrisoya Foods, Inc. v. Sunrich LLC, 626 F. Supp. 2d 985, 992 (D. Minn. 2009) (Montgomery, J.). In this instance, however, there is no fact issue regarding the materiality of West's breach of the non-competition agreement. West blatantly ignored that provision when he facilitated Legacy's move from Farmers to another insurer and the significant monetary losses flowing from that move are directly chargeable to him. West's breach was material as a matter of law.

Because the Contract Value payments hinged on West's compliance with the non-compete provision, West's breach of that provision excuses Farmers from paying West the remaining two installments.

Finally, even if West's contract claim were somehow viable, Farmers still would be excused from payment to offset its undisputed damages, discussed above. See Hogren v. Schlueter, 355 N.W.2d 762, 764 (Minn. Ct. App. 1984) (noting that Minnesota allows the setoff of reciprocal damages awards).

### 2. Failure to Pay Addendum Compensation

West next contends that Farmers breached the DMAA by not paying him pursuant to an "Addendum," which he alleges was incorporated into the DMAA. This claim is patently meritless. The so-called Addendum is in fact entitled "District Projection 13-14-B/Plan C." (Weinstein Ex. D.) The District Projection makes no promises to West as to compensation (or anything else), is not signed by West or directed to West, and, in fact, was created for purposes wholly unrelated to West. Furthermore, the District Projection is not mentioned in or incorporated into the DMAA. It is an extrinsic document and therefore inadmissible under the parol evidence rule.

## C. Discrimination Counterclaim

West also asserts both disparate treatment and retaliation claims under 42 U.S.C. § 1981. Section 1981 affords "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens . . . ." 42 U.S.C. § 1981(a). Section 1981 claims are analyzed under the same standard applied to claims under Title VII. Bennett v. Nucor Corp., 656 F.3d 802, 818 (8th Cir. 2012).

### 1. Discrimination

A party may prove discrimination under § 1981 by either direct or indirect evidence. Because there is no direct evidence of discrimination in this case, the Court must apply McDonnell Douglas burden shifting framework as follows:

> [West] first must establish a prima facie case of discrimination; if a prima facie case is established, the burden of production shifts to [Farmers] to show a legitimate, nondiscriminatory reason for the challenged action; and if [Farmers] proffers such a reason, the burden of production shifts back to [West] to establish that the proffered reason is a mere pretext for discriminatory animus.

Harris v. Hays, 452 F.3d 714, 717-18 (8th Cir. 2006) (citation omitted); McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

To establish a prima facie case, West must show that: (1) he was a member of a protected group; (2) he was meeting Farmers's legitimate performance expectations; (3) he suffered an adverse employment action;[6] and (4) Farmers did not take the same action as to similarly situated employees who were not members of the protected group. Clark v. Runyon, 218 F.3d 915, 918 (8th Cir. 2000).

There is no dispute that West has met his burden with respect to the first and third elements of his prima facie case. West argues that he has met the second factor because he was a high performing District Manager. The record belies this assertion. Starting in January 2009, for example, West was on a performance improvement plan due to his failure to meet Farmers's expectations. (Pierce Aff. Ex. C; see also id. Exs. A, B.) Even assuming West's performance was on target, however, West has not established the final element required to establish his prima facie case.

---

[6] The fact that West resigned before he could be terminated does not change this conclusion, because he resigned in response to being told he would be terminated.

West complains at length, but without much specificity that he was treated differently than similarly situated white district managers. West specifically compares himself to Matt Amack, who he claims had a similar performance record, yet was treated preferentially. West again misses the point. Farmers does not argue that it decided to terminate West because of his performance. Rather, the record is clear that Farmers based its decision on West's disturbing verbal altercation with Lund, who was so traumatized she secured a restraining order and quit her job. West points to no other district manager who engaged in similar conduct. West therefore has not met his burden with respect to his termination.

Although West's briefing is far from clear, West also seems to also claim that he suffered adverse employment action in other ways, examples of which are as follows:

- His supervisor (Locke Pierce) solicited West's counterpart, Matt Amack, for advice, but did not ask West for advice;
- Pierce "forced" West (and only West) to attend weekly meetings to explain his performance;
- West was once required to wait 2 hours for a scheduled meeting with Pierce; and
- Pierce criticized West for his poor recruiting performance, low life insurance sales, his refusal to participate in a March of Dimes fundraiser, and refusal to participate in Farmers sponsored events.[7]

The Eighth Circuit defined an adverse employment action as "a tangible change in working conditions that produces a material employment disadvantage." Spears v. Missouri Dep't of Corr. & Human Res., 210 F.3d 850, 853 (8th Cir. 2000). "Termination, reduction in pay

---

[7] West also alleges that he was subjected to racial jokes, but testified that he could not provide any details about the content of those jokes. (West Dep. at 115-16.)

12

or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard[.]" Id. None of what West alleges, even if he could support it with admissible evidence, approaches the definition of adverse employment action. Moreover, West has not provided the Court with evidence that he was treated differently than other district managers in this regard.

Simply put, West has not offered a citation to any deposition, affidavit, or any other piece of evidence to support his contention of racial discrimination. Nor does he come forward with names of any other employees who were treated differently after engaging in similar conduct. It is West's burden to establish the elements of a prima facie case and he has failed to meet his burden. Farmers is entitled to summary judgment on West's discrimination claim.

### 2. Retaliation

West also claims that Farmers retaliated against him because he complained of discrimination. To establish a prima facie case of retaliation, West must demonstrate that he engaged in a statutorily protected activity, that he suffered an adverse employment action, and that there was a causal connection between the adverse employment action and the protected activity. Stevens v. St. Louis Univ. Med. Ctr., 97 F.3d 268, 270 (8th Cir. 1996). West fails to cite one iota of evidence that he ever complained to Farmers that he was being mistreated due to his race. Thus, there is no evidence that West engaged in a protected activity. Without such activity, there can be no retaliation claim. Id.

**D.     Injunctive Relief, Declaratory Judgment, and Punitive Damages Counterclaims**

Because there is no substance to West's counterclaims, there is no basis for injunctive relief.  See Cox v. Mortg. Elec. Registration Sys., 794 F. Supp. 2d 1060, 1065 (D. Minn. 2011) (Doty, J.) (holding that injunctive relief will not issue when such claims are dependent on legal claims held to be without merit).

Furthermore, West has impermissibly alleged a claim for punitive damages.  Under Minnesota law, "[a] plaintiff must file a motion seeking punitive damages and must include the applicable legal basis and one or more affidavits setting forth the factual grounds supporting issuance of punitive damages." Berczyk v. Emerson Tool Co., 291 F. Supp. 2d 1004, 1009 (D. Minn. 2003) (Erickson, M.J.).  West has not done so here.  His claim for punitive damages is summarily dismissed.

**CONCLUSION**

There are no genuine issues of material fact precluding summary judgment on Plaintiffs' breach-of-contract claim or Defendants' counterclaims.  Accordingly, **IT IS HEREBY ORDERED that** Plaintiffs' Motion for Summary Judgment (Docket No. 57) is **GRANTED** as set forth above.

Dated: April 18, 2013

*s/ Paul A. Magnuson*
Paul A. Magnuson
United States District Court Judge